Filed 7/16/13  Bates v. Chicago Title Co. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ROBERT F. BATES, as Trustee, etc., <br><br> Cross-complainant and Appellant, <br><br> v. <br><br> CHICAGO TITLE COMPANY, <br><br> Cross-defendant and Appellant. | D059205 <br><br><br> (Super. Ct. No. 37-2009-00101454-CU-OR-CTL) |

APPEALS from a judgment and order of the Superior Court of San Diego County, Ronald L. Styn, Judge.  Judgment reversed and remanded; cross-appeal dismissed.

Coughlin Law Firm and Sean C. Coughlin for Cross-Complainant and Appellant.

Fidelity National Law Group, Tao Y. Leung, Christopher D. Greinke and Jacky P. Wang for Cross-defendant and Appellant.

Cross-complainant Robert F. Bates, trustee of the Robert F. Bates Family Trust dated 11-29-90 (Bates) appeals a judgment after the trial court granted the motion for summary judgment filed by cross-defendant Chicago Title Company (CT) in his negligence cross-action against it.  Bates alleges CT was negligent in preparing a deed of

trust to replace one he had previously reconveyed. On appeal, Bates contends the trial court erred by concluding CT did not owe him a legal duty of due care in preparing the replacement trust deed. Because we conclude there are triable issues of material fact regarding whether CT undertook to, and did, prepare the trust deed and the nature and extent of any concomitant undertaking, we conclude the trial court erred by granting CT's motion for summary judgment.

CT filed a cross-appeal contending the trial court erred by denying its motion for leave to augment its expert witness list or, in the alternative, leave to submit tardy expert witness information. Because that order is nonappealable, we dismiss the cross-appeal.

FACTUAL AND PROCEDURAL BACKGROUND

On September 17, 2002, Raytheon Development, Inc. (Raytheon), by its president, Kevin A. Tucker, executed as trustor a deed of trust (2002 Trust Deed) encumbering certain property it owned at 3655 Ruffin Road in San Diego (Property) to secure a $450,000 promissory note (Note) it made payable to Bates, the beneficiary of the 2002 Trust Deed. On September 20, the 2002 Trust Deed was recorded in the San Diego County Recorder's Office.

On October 25, 2002, Raytheon, by its president (Tucker), executed a grant deed (Grant Deed) conveying its ownership interest in the Property to Ruffin Road Venture Lot 3, a Nevada corporation (RRV3). On November 13, the Grant Deed was recorded in the San Diego County Recorder's Office. Bates and his son, Robert L. Bates, apparently were unaware of the Grant Deed transferring ownership of the Property at that time. At

2

some point during 2002, Bates retired and his son, Robert L. Bates, assumed most of his duties related to servicing of the loan evidenced by the Note.

In November or December 2003, San Diego County Credit Union (SDCCU) and RRV3 (apparently by Tucker, its president) opened an escrow with CT, as escrow holder, for a $1,600,000 loan to be made by SDCCU to RRV3 secured with a deed of trust encumbering the Property. Renee Marshall, an escrow officer with CT, handled the escrow. CT was also the title insurer in the loan transaction. The SDCCU loan escrow apparently could not close unless Bates reconveyed or subordinated the 2002 Trust Deed so the SDCCU deed of trust would be first in priority. On or about March 18, 2004, CT sent Bates a request for demand and full reconveyance, a beneficiary's demand, and substitution of trustee and a full reconveyance of the 2002 Trust Deed. Tucker purportedly requested that Bates and CT agree that if Bates reconveyed the 2002 Trust Deed, then Tucker would execute a replacement trust deed after the SDCCU loan escrow closed.[1] Bates purportedly would not execute the reconveyance of the 2002 Trust Deed and submit a beneficiary demand for $0 unless CT assured him that a replacement deed of trust would be prepared, executed, and notarized. In a telephone conversation with Robert L. Bates, Marshall purportedly confirmed CT would prepare a replacement deed of trust and ensure that it was executed and notarized. On or about March 24, Bates executed and delivered to CT a substitution of trustee and full reconveyance of the 2002

---

[1]     This and other factual assertions were set forth in the declaration of Robert L. Bates in opposition to CT's motion for summary judgment.

Trust Deed and a beneficiary's demand for $0. On April 9, apparently about the time the SDCCU loan escrow closed, the substitution of trustee and full reconveyance of the 2002 Trust Deed was recorded in the San Diego County Recorder's Office. Also on April 9, a deed of trust executed by RRV3, by its president (Tucker), encumbering the Property as security for the $1,600,000 loan made by SDCCU, its beneficiary, was recorded in the San Diego County Recorder's Office.[2]

On April 23, 2004, trustor Raytheon, by its president, Tucker, executed a deed of trust (2004 Trust Deed) encumbering the Property to secure the 2002 Note in the amount of $450,000 it made to Bates, the beneficiary of the 2004 Trust Deed.[3] Marshall notarized Tucker's signature on the 2004 Trust Deed. Tucker apparently delivered the executed 2004 Trust Deed to Robert L. Bates, who later had it recorded in the San Diego County Recorder's Office on May 17, 2004.

In December 2007, The Alliance Portfolio, a California corporation (Alliance), apparently made a $600,000 loan to RRV3 secured by a deed of trust executed by trustor RRV3, by its president (Tucker), encumbering the Property. In June 2009, with the 2002 Note apparently in default, Bates recorded a notice of default under the 2004 Trust Deed.

---

[2]     Although the first page of the deed of trust named RRV3 as the trustor, its signature page listed both RRV3 and Raytheon as trustors. Furthermore, Tucker signed the deed of trust twice on signature lines for the president and secretary of *Raytheon*, not RRV3. In deciding this appeal, we do not address the effect of that inconsistency and apparent mistake.

[3]     The 2004 Trust Deed stated it was "made September 16, 2002" (the date of the 2002 Trust Deed), yet it was executed by Tucker on April 23, 2004.

In November 2009, Alliance and other plaintiffs filed a complaint against Bates, Raytheon, and RRV3 alleging causes of action for quiet title, injunctive relief, slander of title, declaratory relief, and cancellation of instrument and damages. The complaint alleged that at the time Raytheon executed the 2004 Trust Deed it did not have any right, title, or interest in and to the Property and therefore the 2004 Trust Deed was invalid and did not create a lien against the Property. The complaint sought relief enjoining the foreclosure sale of the Property by Bates and declaring the 2004 Trust Deed void.

Bates filed a cross-complaint against CT, Alliance, Raytheon, RRV3 and others, alleging causes of action for declaratory relief, negligence, indemnity, and contribution. In his negligence cause of action against CT, Bates alleged:

> "28. While the above-described SDCCU Escrow was pending, as described above, [CT] agreed to act on behalf of [Bates] to properly consummate the above-described reconveyance and re-recording transaction. In doing so, [CT] owed a duty of care to [Bates] to properly handle the reconveyance and re-recording transaction.
>
> "29. . . . [CT] acted negligently, in that in assisting [Bates] with the reconveyance and re-recording transaction, and in preparing the [2002 Trust Deed] to be re-executed and re-recorded, [CT] failed to take the care necessary and required of an escrow company in the same or similar role to prevent exposure to [Bates] to the types of claims and allegations contained in the Complaint filed by [Alliance].
>
> "30. [Bates] relied on the services of [CT] in that [CT] acted as the escrow agent for the SDCCU transaction, knew that the obligation underlying the [2002 Trust Deed] was not paid through the SDCCU transaction or otherwise, and assented to assist [Bates] with the reconveyance and re-recording transaction."

5

CT filed a demurrer to the cross-complaint. The trial court sustained the demurrer as to the declaratory relief, indemnity, and contribution causes of action and overruled the demurrer as to the negligence cause of action.

CT then filed a motion for summary judgment on Bates's negligence cause of action, arguing it did not agree to properly consummate the re-recording transaction and therefore did not owe Bates any duty of care. CT also argued that even if it agreed to, and did, prepare the 2004 Trust Deed, Bates did not instruct it to verify that Raytheon was the record title holder of the Property when the 2004 Trust Deed was prepared, did not order a preliminary title report, and did not ask it to insure the priority of the 2004 Trust Deed or otherwise guarantee the vesting of the 2004 Trust Deed. In support of its motion, CT submitted a separate statement of undisputed material facts, Marshall's declaration, and an appendix of evidence. CT also filed a motion for leave to augment its expert witness list and declaration or, in the alternative, leave to submit tardy expert witness information.

Bates opposed CT's motion for summary judgment, arguing there are triable issues of material fact that precluded summary judgment. He argued CT agreed to, and did, prepare a deed of trust to replace the 2002 Trust Deed and negligently prepared the 2004 Trust Deed by mistakenly listing the wrong trustor on it. He further argued CT owed him a duty to correctly prepare the 2004 Trust Deed and knew, based on its handling of the SDCCU escrow, who the correct trustor was (i.e., RRV3 and not Raytheon). In support of his opposition, Bates submitted a separate statement of undisputed material facts, a declaration of Robert L. Bates, and a lodgment of exhibits. Bates also opposed CT's

6

motion for leave to augment its expert witness list and declaration or, in the alternative, leave to submit tardy expert witness information.

CT filed a reply in support of its motion for summary judgment. It argued that it fully complied with the SDCCU escrow instructions. It argued the undisputed facts showed a replacement trust deed was prepared because the 2004 Trust Deed contained material terms identical to those in the 2002 Trust Deed. Because the 2004 Trust Deed identified the same trustor, the same property, and same beneficiary as in the 2002 Trust Deed, CT argued it was a "replacement" trust deed. CT also argued it was not instructed by Bates, either expressly or implicitly, to search the title for the Property or otherwise verify the vesting information for the 2004 Trust Deed. Furthermore, it argued it would be unreasonable to expect Marshall to know or recall the proper vesting for the 2004 Trust Deed based on her handling of the SDCCU escrow.

On December 23, 2010, the trial court denied CT's motion for leave to augment its expert witness list. The court granted CT's motion for summary judgment. On January 20, 2011, the court entered judgment for CT on Bates's cross-complaint against it. Bates timely filed a notice of appeal, challenging the summary judgment. CT timely filed a notice of cross-appeal, challenging the order denying its motion for leave to augment.

DISCUSSION

*BATES'S APPEAL*

I

*Summary Judgment Standard of Review*

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334; see *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.) "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)

*Aguilar* clarified the standards that apply to summary judgment motions under Code of Civil Procedure section 437c.[4] (*Aguilar*, *supra*, 25 Cal.4th at pp. 843-857.) Generally, if all the papers submitted by the parties show there is no triable issue of material fact and the " 'moving party is entitled to a judgment as a matter of law,' " the court must grant the motion for summary judgment. (*Aguilar*, at p. 843, quoting § 437c, subd. (c).) Section 437c, subdivision (p)(2), states:

> "A defendant . . . has met his or her burden of showing that a cause
> of action has no merit if that party has shown that one or more

---

[4]     All statutory references are to the Code of Civil Procedure unless otherwise specified.

8

elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto."

*Aguilar* made the following observations:

"First, and generally, from commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. . . .

"Second, and generally, the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question. . . .

"Third, and generally, how the parties moving for, and opposing, summary judgment may each carry their burden of persuasion and/or production depends on *which* would bear *what* burden of proof at trial. . . . [I]f a defendant moves for summary judgment against . . . a plaintiff [who would bear the burden of proof by a preponderance of the evidence at trial], [the defendant] must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not--otherwise, *he* would not be entitled to judgment *as a matter of law*, but would have to present *his* evidence to a trier of fact." (*Aguilar*, *supra*, 25 Cal.4th at pp. 850-851, fns. omitted.)

*Aguilar* stated:

9

"To speak broadly, all of the foregoing discussion of summary judgment law in this state, like that of its federal counterpart, may be reduced to, and justified by, a single proposition: *If a party moving for summary judgment in any action . . . would prevail at trial without submission of any issue of material fact to a trier of fact for determination, then he should prevail on summary judgment.* In such a case, . . . the 'court should grant' the motion 'and avoid a . . . trial' rendered 'useless' by nonsuit or directed verdict or similar device." (*Aguilar*, *supra*, 25 Cal.4th at p. 855, italics added.)

"[E]ven though the court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact, it must nevertheless determine what any evidence or inference *could show or imply to a reasonable trier of fact*. . . . In so doing, it does not decide on any finding of its own, but simply decides what finding such a trier of fact could make for itself." (*Aguilar*, *supra*, 25 Cal.4th at p. 856.) "[I]f the court determines that all of the evidence presented by the plaintiff, and all of the inferences drawn therefrom, show and imply [the ultimate fact] *only as likely as* [not] *or even less likely*, it must then grant the defendants' motion for summary judgment, even apart from any evidence presented by the defendants or any inferences drawn therefrom, because a reasonable trier of fact could not find for the plaintiff. Under such circumstances, the [factual] issue is not triable--that is, it may not be submitted to a trier of fact for determination in favor of either the plaintiff or the defendants, but must be taken from the trier of fact and resolved by the court itself in the defendants' favor and against the plaintiff." (*Id*. at p. 857, fn. omitted.)

"On appeal, we exercise 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to

10

judgment as a matter of law.' [Citation.] 'The appellate court must examine only papers before the trial court when it considered the motion, and not documents filed later. [Citation.] Moreover, we construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the party opposing it.' " (*Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1201-1202.)

## II

### *Negligence Claims Generally*

In California, the general rule is that all persons have a duty to use ordinary care to prevent others from being injured as a result of their conduct. (Civ. Code, § 1714; *Rowland v. Christian* (1968) 69 Cal.2d 108, 112-113.) "The elements of a cause of action for negligence are: duty; breach of duty; legal cause; and damages. [Citations.] The existence of a duty is the threshold element of a negligence cause of action." (*Friedman v. Merck & Co.* (2003) 107 Cal.App.4th 454, 463.) " 'The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion. [Citations.] Whether this essential prerequisite to a negligence cause of action has been satisfied in a particular case is a question of law to be resolved by the court.' " (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 614.) "To say that someone owes another a duty of care ' "is a shorthand statement of a conclusion, rather than an aid to analysis in itself. . . . '[D]uty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection."

11

[Citation.]'  [Citation.]  '[L]egal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done.' "  (*Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 933.) "[T]he question of the existence and scope of a defendant's duty of care is a legal question which depends on the nature of the . . . activity in question and on the parties' general relationship to the activity, and is an issue to be decided by the court, rather than the jury."  (*Knight v. Jewett* (1992) 3 Cal.4th 296, 313.)

*Rowland* set forth certain policy considerations that should be taken into account in determining whether a legal duty of care should be imposed in a particular case. "*Rowland* enumerates a number of considerations, however, that have been taken into account by courts in various contexts to determine whether a departure from the general rule [i.e., that a duty of due care exists to avoid injuring others] is appropriate: 'the major [considerations] are *the foreseeability of harm to the plaintiff*, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' (Italics added.)  [Citation.]  The foreseeability of a particular kind of harm plays a very significant role in this calculus [citation], but a court's task--in determining 'duty'--is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether

the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 572-573, fn. 6.)

However, when the alleged injury is other than physical harm, a different set of considerations may apply in determining whether a duty of care exists. (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397.) In the absence of privity of contract, *Biakanja v. Irving* (1958) 49 Cal.2d 647 set forth certain factors that should be considered in determining whether a duty of care and negligence liability should be imposed in a particular case. *Biakanja* stated:

> "The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (*Id.* at p. 650.)

Under negligence principles, a person generally has no duty to protect another from harm in the absence of a special relationship or custody or control. (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 293.) However, if a person voluntarily or gratuitously undertakes to perform services, a duty to exercise due care in performing those services exists. "A person not required to perform services for another may sometimes do so in a voluntary or gratuitous undertaking, and in that case, is under a duty to exercise due care in performance." (6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1060, p. 371.) Alternatively stated, "[a] defendant who enters upon an

13

affirmative course of conduct affecting the interests of another is regarded as assuming a duty to act, and will be liable for negligent acts or omissions [citations], because one who undertakes to do an act must do it with care. [Citations.] As [Prosser, Handbook of the Law of Torts (4th ed. 1971) § 56, p. 346] states: 'Where performance clearly has begun, there is no doubt that there is a duty of care.' " (*Bloomberg v. Interinsurance Exchange* (1984) 162 Cal.App.3d 571, 575.)

The principle that a person may be liable for negligent performance of a voluntary undertaking has been applied in cases involving only financial loss and without any physical harm to persons or property. In *Valdez v. Taylor Automobile Co.* (1954) 129 Cal.App.2d 810 (*Valdez*), a car dealer advertised that the purchase price of a car would include the cost of a liability insurance policy for a car buyer. (*Id*. at p. 812.) The plaintiff bought a car and informed the salesperson he wanted full coverage insurance to protect himself from liability in the event of an accident. (*Ibid*.) The salesperson stated he would obtain that insurance and prepared documents for the sale and insurance. (*Id*. at p. 813.) When the plaintiff was sued following a car accident, he tendered his defense to the car dealer. (*Id*. at p. 814.) The dealer declined and a money judgment was entered against the plaintiff. (*Ibid*.) The plaintiff then filed an action against the dealer for breach of contract, negligence, and fraud. (*Id*. at p. 812.) Although the jury apparently rejected the plaintiff's breach of contract claim, it found the dealer liable and awarded the plaintiff $18,465. (*Id*. at p. 815.)

On appeal, the car dealer argued that because the jury found there was no contract obligating it to obtain insurance for the plaintiff, it had no duty to procure that insurance

14

and, absent such contractual duty, the plaintiff could not recover for the dealer's negligent failure to procure that insurance. (*Valdez*, *supra*, 129 Cal.App.2d at p. 817.) *Valdez* rejected that argument, stating: "It is well established that a person may become liable in tort for negligently failing to perform a voluntarily assumed undertaking even in the absence of a contract to do so. A person may not be required to perform a service for another but he may undertake to do so--called a voluntary undertaking. In such a case the person undertaking to perform the service is under a duty to exercise due care in performing the voluntarily assumed duty, and a failure to exercise due care is negligence. Dean Prosser says, '[I]f the defendant enters upon an affirmative course of conduct affecting the interests of another, he is regarded as assuming a duty to act, and will thereafter be liable for negligent acts or omissions,' and '. . . [t]here is authority that where the defendant has reason to expect such reliance to the plaintiff's detriment, even a mere gratuitous promise will be enough to create a duty, for the breach of which a tort action will lie.' " (*Id*. at pp. 817-818.) *Valdez* modified the judgment awarding the plaintiff damages in tort and affirmed the judgment, as so modified. (*Id*. at p. 823.)

*Aim Insurance Co. v. Culcasi* (1991) 229 Cal.App.3d 209 (*Aim Insurance*), cited by Bates, involved similar factual circumstances in which the defendant allegedly failed to obtain insurance despite a voluntary undertaking to do so. (*Id*. at pp. 215-217.) *Aim Insurance* cited *Valdez* with approval and concluded the allegations in its case "state a cause of action for negligence based on Culcasi's alleged breach of his duty to perform with due care the task he undertook and upon which [the plaintiff] relied." (*Aim Insurance,* at p. 216; see also *Cooper v. State Farm Mutual Automobile Ins. Co.* (2009)

15

177 Cal.App.4th 876, 904 [complaint sufficiently alleged cause of action for negligent voluntary undertaking and/or promissory estoppel based on defendant's alleged failure to preserve tire evidence despite voluntary representation it would preserve that evidence].)

In *Artiglio v. Corning Inc.*, *supra*, 18 Cal.4th at page 613, the California Supreme Court cited with approval *Valdez*'s description of the duty of care arising out of a voluntary undertaking. *Artiglio* stated it had previously described the negligent undertaking theory of liability as firmly rooted in the common law of negligence. It stated: "Thus, it is settled law that one 'who, having no initial duty to do so, undertakes to come to the aid of another--the 'good Samaritan' "--has 'a duty to exercise due care in performance and is liable if (a) his failure to exercise care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.' ([Citations]; see also BAJI No. 4.45 ['A person who is under no duty to care for or render service to another but who voluntarily assumes such a duty, is liable to the other for injury caused by a failure to exercise ordinary or reasonable care in the performance of that assumed duty.'].)" (*Artiglio,* at p. 613, fn. omitted.) *Artiglio* stated: "[A] negligent undertaking claim of liability to third parties requires evidence that: (1) the actor . . . undertook, gratuitously or for consideration, to render services to another . . . ; (2) the services rendered were of a kind the actor should have recognized as necessary for the protection of third persons (plaintiffs); (3) the actor failed to exercise reasonable care in the performance of its undertaking; (4) the failure to exercise reasonable care resulted in physical harm to the third persons; and (5) either (a) the actor's carelessness increased the risk of such harm, or (b) the undertaking was to perform a duty owed by the other to the

16

third persons, or (c) the harm was suffered because of the reliance of the other or the third persons upon the undertaking." (*Id*. at pp. 613-614.) Based on *Artiglio*'s citation of *Valdez* and other authorities with approval, we believe the Supreme Court intended to approve the application of the voluntary undertaking theory of duty in negligence cases regardless of the type of damages suffered (i.e., both cases involving physical harm to persons or property and cases involving only economic loss). To the extent *Artiglio* phrased the voluntary undertaking theory as requiring *physical* harm to third persons, we believe it did so because the plaintiffs in that case suffered physical harm allegedly caused by silicone gel breast implants. (*Id*. at pp. 610-611.) CT has not cited, and we are unaware of, any decision by the Supreme Court involving only economic loss that expressly holds the voluntary undertaking theory of duty under negligence law does not apply. We decline to restrict the application of that theory in cases in which public policy supports its application.

### III

### *Order Granting CT's Motion for Summary Judgment*

Bates contends the trial court erred by granting CT's motion for summary judgment. He asserts there is, at a minimum, a triable issue of material fact regarding whether CT voluntarily undertook to prepare the 2004 Trust Deed and therefore owed him a duty of due care.

### A

In moving for summary judgment, CT argued that it did not agree to properly consummate the re-recording transaction and therefore did not owe Bates any duty of

17

care.  In its separate statement of undisputed material facts, CT asserted: "Neither Tucker nor Bates asked [CT] to 'properly consummate' the 're-recording' transaction as an accommodation."  In support of that asserted undisputed fact, CT cited Marshall's declaration in which she stated: "In connection with my notarization of Tucker's signature to the 2004 Deed of Trust, neither Tucker nor Bates opened an escrow with me or [CT]. They never asked me or [CT] to 'properly consummate' the 're-recording' transaction as an accommodation."  Marshall's declaration also stated: "In December 2003, [SDCCU] and [RRV3], through [Tucker], opened an escrow with [CT] for a $1.6 million loan by SDCCU to RRV3 that would be secured by a deed of trust against the [Property] (the 'SDCCU Escrow').  I was [CT]'s escrow holder for the SDCCU Escrow. . . .  Based upon my review of the escrow file, including [the] escrow instructions, the only parties to the SDCCU Escrow were SDCCU and RRV3.  There is no evidence that I am aware of indicating that Bates was a party to the SDCCU Escrow."  Marshall stated: "[CT] did not record or cause to be recorded the 2004 Deed of Trust.  Additionally, . . . [CT] neither obtained a preliminary title report nor issued any title insurance policy in connection with the 2004 Deed of Trust.  No one instructed me to perform a title search on the Property or otherwise verify the vesting information on the 2004 Deed of Trust."  Marshall further declared: "I do not believe I had any involvement with the preparation of the 2004 [Trust Deed] other than notarizing it.  This is because the 2004 Deed of Trust was typed on a pre-printed [stationery] form provided by [CT] (in blank form) to its clients.  When I prepare deeds of trust for recording against real property in California, I use computer-generated forms."

18

In opposing CT's motion for summary judgment, Bates argued that CT agreed to, and did, prepare a deed of trust to replace the 2002 Trust Deed and negligently prepared the 2004 Trust Deed by mistakenly listing the wrong trustor (i.e., Raytheon, instead of RRV3) on it. He further argued CT owed him a duty to correctly prepare the 2004 Trust Deed and knew, based on its handling of the SDCCU escrow, who the correct trustor was (i.e., RRV3 and not Raytheon). In support of his opposition, Bates submitted a separate statement of undisputed material facts, in which he asserted he "was a party to the [SDCCU] escrow to the extent that [CT] agreed that if Mr. Bates reconveyed his 2002 Deed of Trust with a zero [pay-out] so the SDCCU Escrow could close, [CT] would ensure that it would prepare a replacement deed of trust for Mr. Bates following the close of the SDCCU Escrow." Bates disputed CT's assertion that neither Tucker nor Bates asked it to "properly consummate" the "re-recording" transaction as an accommodation. To refute CT's asserted fact, Bates asserted:

> "While the SDCCU Escrow was still pending, Mr. Bates, Jr.[,] called Renee Marshall to confirm that [CT] would prepare the replacement deed of trust and ensure that it was executed and notarized soon after the close of the SDCCU Escrow. Ms. Marshall confirmed that this would be done. Essentially, Ms. Marshall provided complete assurances that if Mr. Bates submitted a zero beneficiary demand and executed the Reconveyance, she would ensure the replacement deed of trust would be executed and notarized."

Also, refuting CT's assertion that it did not obtain a preliminary title report in connection with the 2004 Trust Deed, Bates asserted: "As escrow holder and title insurer for the SDCCU Escrow, [CT] was in possession of the preliminary reports issued in connection with the SDCCU Escrow, which closed on April 9, [2004]. [¶] . . . [¶] . . . [CT] simply

19

failed to correctly type in the information they already knew, and which had not changed." Refuting CT's assertion that no one instructed Marshall to perform a title search on the Property or otherwise verify the vesting information on the 2004 Trust Deed, Bates asserted:

> "As escrow holder and title insurer for the SDCCU Escrow, [CT] was in possession of the preliminary reports issued in connection with the SDCCU Escrow, which closed on April 9, [2004]. Further, [CT] knew who the owner of the Property was on April 23, 2004, the date the [2004 Trust Deed] was executed."

As additional disputed material facts, Bates asserted: "In that she was the escrow officer for the SDCCU Escrow, on April 23, [2004], Renee Marshall knew that the owner of the Property was [RRV3]." He made further assertions citing the declaration of Robert L. Bates, in which he declared:

> "7. . . . While the SDCCU Escrow was pending, [Tucker], the principal of RRV3, requested that my father and [CT] enter [into] an agreement whereby my father would reconvey his deed of trust [i.e., the 2002 Trust Deed], and then Mr. Tucker would re-execute a replacement deed of trust after the close of the SDCCU Escrow (the 'Bates 2004 Deed of Trust' [i.e., the 2004 Trust Deed]).
>
> "8. My father would only agree to reconvey his 2002 [Trust Deed] (and submit a zero beneficiary demand on a Note with a significant balance), if [CT] would ensure that a replacement deed of trust transaction was consummated by 1) preparing the replacement deed of trust and 2) having it executed and notarized.
>
> "9. In this regard, while the SDCCU Escrow was still pending, I called Renee Marshall to confirm that [CT] would prepare the replacement deed of trust and ensure that it was executed and notarized soon after the close of the SDCCU Escrow. Ms. Marshall confirmed that this would be done. It is my understanding that the SDCCU Escrow could not have closed unless my father reconveyed his 2002 [Trust Deed]. Essentially, Ms. Marshall provided complete assurances that if my father submitted a zero beneficiary demand

20

and executed the Reconveyance, she would ensure the replacement deed of trust would be executed and notarized. I considered [CT]'s agreement in this regard to be part of and in furtherance of the SDCCU Escrow. If Ms. Marshall had not confirmed that [CT] would handle this transaction, my father would have either not agreed to execute the reconveyance of the 2002 [Trust Deed], or otherwise would have instructed a third party to handle the transaction on his behalf."

Bates further declared:

"10. Thereafter, on or about March 18, 2004, Ms. Marshall prepared and forwarded the following documents for my father's signature: 1) Request for Demand and Full Reconveyance . . . ; 2) Beneficiary's Demand . . . ; [and] 3) Substitution of Trustee and Full Reconveyance . . . . In reliance upon Ms. Marshall's confirmation that [CT] would ensure that a replacement deed of trust would be prepared, executed, and notarized, my father submitted a 'zero' beneficiary demand and executed the Reconveyance.

"11. I am informed and believe that the SDCCU Escrow closed approximately April 9, 2004. Also in April 2004, my father was participating in another lending transaction in which he would receive two deeds of trust recorded against 1) real property owned by Stage Coach Ventures, LLC, an entity owned or controlled by [Tucker] (the 'Stagecoach Deed of Trust'), and 2) residential real property owned by Theresa Tucker, Mr. Tucker's wife (the 'Atrium Deed of Trust'). [CT] acted as the Escrow officer and the title insurer for these transactions [citation]. Around this time, I also inquired with Renee Marshall regarding the status of the preparation and execution of the replacement deed of trust on the Property. Ms. Marshall confirmed again that [CT] would ensure that this replacement deed of trust would be prepared, executed, and notarized.

"12. On April 23, 2004, the same day that the replacement deed of trust on the [Property] was to be executed, Renee Marshall faxed the drafts of the Stagecoach and Atrium Deeds of Trust to my office for my review. [Citation.] The draft of the Stage Coach Deed of Trust faxed by Ms. Marshall to me was prepared on the exact same typewritten form . . . as the [2004 Trust Deed], on the same day that the [2004 Trust Deed] was presented to Mr. Tucker for signature at Renee Marshall's office. [Citations.] Although, prior to March 19,

21

[2004], I had instructed Ms. Marshall to ensure that the [replacement] deed of trust be prepared, I believe that either Renee Marshall, one of her assistants, or another [CT] employee prepared the [2004 Trust Deed] actually on April 23, [2004], knowing that Mr. Tucker would be meeting with Ms. Marshall to execute the Stagecoach and the Atrium Deeds of Trust. [¶] . . . [¶]

"14. I did not prepare the [2004 Trust Deed]. My father did not prepare the [2004 Trust Deed]. . . . I have no reason to believe that anyone other than Renee Marshall, or another [CT] employee in her office, prepared this deed of trust. In that Ms. Marshall acted as the escrow officer for the SDCCU Escrow, I believe it was rational for me to assume that Ms. Marshall knew who the owner of the Property was, and to my knowledge, Ms. Marshall has never denied that she knew that [RRV3] was the owner of the Property on April 23, [2004]."

Bates also lodged certain documents, including excerpts from Tucker's deposition. In that deposition, Tucker stated he did not bring any deeds of trust with him when meeting with Marshall on April 23, 2004. He stated he did not prepare the 2004 Trust Deed and that he "got it from her [Marshall]. . . . I went to her office and picked it up and signed it with her."

In reply, CT argued the undisputed facts showed a "replacement" trust deed was, in fact, prepared because the 2004 Trust Deed contained material terms identical to those in the 2002 Trust Deed. Because the 2004 Trust Deed identified the same trustor (i.e., Raytheon), the same property, and same beneficiary, CT argued the 2004 Trust Deed was a "replacement" trust deed. CT also argued it was not instructed by Bates, either expressly or implicitly, to search the title for the Property or otherwise verify the vesting information for the 2004 Trust Deed. Furthermore, it argued it would be unreasonable to

22

expect Marshall to know or recall the proper vesting for the 2004 Trust Deed based on her handling of the SDCCU escrow.

At oral argument on CT's motion for summary judgment, Bates argued that "[t]he uncontroverted evidence is that [CT] knew the correct vesting information. [Bates had] [n]o need to request that they verify it. . . . [CT] has never disputed . . . that they knew the correct vesting information at the time the request was made to prepare the deed of trust. The [alleged] negligence is just failing to insert that correct vesting information in the [2004 Trust Deed], not failing to search title [because] they didn't need to." Bates argued CT knew the correct vesting information (i.e., that RRV3, and not Raytheon, was the correct trustor for the 2004 Trust Deed) because "the request was made during the pendency of the [SDCCU] transaction," which involved RRV3 as the owner of the property and trustor of the SDCCU trust deed. In reply, CT argued: "[T]hat's information gained from another escrow which happened prior to the actual transaction we're talking about. . . . I don't think that would be a sensible way of verifying vesting on a deed of trust to use information acquired from an escrow that closed weeks ago."

The trial court granted CT's motion for summary judgment, stating:

> "Even if [Bates] establishes that [CT] agreed to 'consummate' the 2004 [Trust Deed] re-recording transaction, Bates fails to establish that [CT] was required to verify the vesting information in the 2004 [Trust Deed]. [¶] . . . [¶]
>
> "[CT] submits evidence that the 2004 [Trust Deed] is identical to the 2002 [Trust Deed] -- it identifies the same trustor, trust properties and same beneficiaries as the 2002 [Trust Deed]. [Citation.] In essence, the 2004 [Trust Deed] is a replacement -- precisely what [CT] allegedly agreed to provide.

23

"It is undisputed that the 2004 [Trust Deed] identifies Raytheon, not RRV3[,] as the trustor [citation]. . . . Bates provides no authority establishing that an instruction to an escrow holder to prepare a deed of trust 'implies' a duty to search title or verify vesting. Nor is evidence that [CT] agreed to consummate the 2004 [Trust Deed] re-recording transaction, and [CT's] involvement in the related 2004 SDCCU Escrow, sufficient to establish an implied obligation to verify vesting. [¶] . . . [¶]

"By virtue of artful pleading, [Bates] seeks to recharacterize a very informal, almost casual, arrangement into a formal legal commitment. In doing so, he seeks to place himself in a better position than a party who requests and relies on a preliminary report of title. But if a party who relies on such a report is unable to hold the title company liable as an abstractor [citation], there would appear to be no basis on which [Bates] can do so. [Citation.]

"Absent establishing [CT's] obligation to verify the vesting information in the 2004 [Trust Deed], Bates'[s] claims against [CT] fail."

Accordingly, the trial court entered judgment for CT on Bates's cross-complaint against it.

B

Based on our independent review of the parties' summary judgment papers, we conclude there are triable issues of material fact that preclude summary judgment in the circumstances of this case. First, there are triable issues of fact regarding whether CT (by Marshall or another employee) agreed or undertook to prepare, and did prepare, a trust deed to replace the 2002 Trust Deed. CT asserted that neither Tucker nor Bates asked it to "properly consummate" the re-recording transaction as an accommodation. CT argued that because Bates cannot show it actually agreed to prepare the 2004 Trust Deed as an accommodation to him, CT did not owe any duty of care to him and could not have

24

breached any such duty. Also, Marshall stated in her declaration that she did not believe she "had any involvement with the preparation of the 2004 [Trust Deed] other than notarizing it."

However, in opposing CT's motion for summary judgment, Bates asserted that during the SDCCU escrow Marshall confirmed CT would prepare a trust deed to replace the 2002 Trust Deed and would have it executed and notarized. Robert L. Bates declared that while the SDCCU escrow was still open Marshall confirmed CT "would prepare the replacement deed of trust and ensure that it was executed and notarized soon after the close of the SDCCU Escrow." Furthermore, Bates asserted that, contrary to Marshall's declaration, she or another CT employee did, in fact, prepare the 2004 Trust Deed. Robert L. Bates declared that he did not prepare the 2004 Trust Deed and Tucker stated at his deposition that he did not prepare it. Tucker stated that on April 23, 2004, he went to Marshall's office, received the 2004 Trust Deed from her, and signed it with her.

Based on the above evidence, we conclude there are triable issues of fact whether Marshall agreed, on behalf of CT, to prepare a deed of trust to replace the 2002 Trust Deed and whether she (or another CT employee) did, in fact, prepare the 2004 Trust Deed. Those triable issues, when considered together with the triable issue discussed below regarding CT's alleged undertaking, precluded summary judgment for CT.

Second, assuming Bates shows that CT (by Marshall or another employee) agreed to--or undertook to--prepare, and did prepare, a trust deed to replace the 2002 Trust Deed, there is a triable issue of fact regarding the nature and extent of that agreement or undertaking. For Bates to prove his negligence cause of action against CT, he must

25

initially show CT owed him a duty of due care in the preparation of the 2004 Trust Deed. The nature and extent of any such alleged duty is necessarily dependent on the nature and extent of CT's actual undertaking. However, the parties disagree regarding the nature and extent of that alleged undertaking. CT denies it agreed to "properly consummate" the re-recording transaction or that it was instructed to verify the 2004 Trust Deed's vesting information. In contrast, Bates asserts CT agreed to prepare a replacement trust deed and have it executed and notarized. Furthermore, because Marshall was the escrow officer for the pending SDCCU escrow at the time of that agreement or undertaking, Bates asserts she knew the identity of the correct trustor for the replacement trust deed (i.e., RRV3 and not Raytheon). Bates further asserts that because CT was the escrow holder and title insurer for the SDCCU escrow, CT possessed the preliminary reports issued in connection with the SDCCU Escrow, which showed RRV3 was the owner of the Property and therefore the correct trustor for the replacement trust deed. Therefore, Bates asserts that at the time CT made the alleged agreement or undertaking to prepare the replacement trust deed, it knew the correct trustor (i.e., RRV3) for that trust deed.

Because the parties disagree and the evidence is conflicting (or at least unclear) regarding the nature and extent of any alleged undertaking by CT, there is a triable issue of material fact regarding what, if anything, CT undertook to do for Bates. Even if it is found that CT undertook to prepare a "replacement" trust deed, the parties disagree on the meaning of the term "replacement" in this case. CT argues the term "replacement" trust deed merely means a trust deed with material terms identical to those in the 2002 Trust Deed (e.g., the same trustor, beneficiary, and property). In contrast, Bates argues the

26

term "replacement" trust deed means a trust deed that contains the correct trustor and other terms to the extent they are within CT's knowledge. Bates does not argue CT was asked to perform a title search or otherwise verify the vesting information for the replacement trust deed.

Until these disputed questions of fact are resolved, the question of law regarding the existence and scope of CT's duty of due care cannot be determined. Accordingly, the trial court erred by concluding there are no triable issues of material fact and CT was entitled to summary judgment as a matter of law. The court erred by concluding that, assuming CT agreed to prepare a "replacement" trust deed, CT did not owe Bates any legal duty of due care in preparing the 2004 Trust Deed. Unlike other cases in which the facts underlying an alleged duty of care are undisputed, this case involves disputed facts that preclude a court from determining the existence and scope of any legal duty of care until certain preliminary factual findings have been made. Disputed questions for the trier of fact include (but are not limited to): (1) whether CT undertook to prepare a "replacement" trust deed; (2) if so, what does the term "replacement" mean in the context of this case; and (3) did CT actually prepare the 2004 Trust Deed? If it is found that CT agreed or undertook to prepare a deed of trust to replace the 2002 Trust Deed and prepared the 2004 Trust Deed, CT owed Bates a duty of due care to prepare the 2004 Trust Deed using the knowledge it gained through the related SDCCU escrow (e.g., RRV3 was the owner of the Property and thus the correct trustor for the 2004 Trust Deed).

27

On resolution of those factual questions, the trial court may then address the questions of law regarding the existence and scope of any legal duty of care CT owed to Bates. Without addressing the merits of those questions of law in this appeal, we nevertheless direct the trial court's attention to cases discussed above relating to a voluntary or gratuitous undertaking by a party. "A defendant who [voluntarily or gratuitously] enters upon an affirmative course of conduct affecting the interests of another is regarded as assuming a duty to act, and will be liable for negligent acts or omissions [citations], because one who undertakes to do an act must do it with care. [Citations.] As [Prosser, Handbook of the Law of Torts, *supra*, § 56, p. 346] states: 'Where performance clearly has begun, there is no doubt that there is a duty of care.' " (*Bloomberg v. Interinsurance Exchange*, *supra*, 162 Cal.App.3d at p. 575.) Likewise, as *Valdez* stated: "It is well established that a person may become liable in tort for negligently failing to perform a voluntarily assumed undertaking even in the absence of a contract to do so. A person may not be required to perform a service for another but he may undertake to do so--called a voluntary undertaking. In such a case the person undertaking to perform the service is under a *duty to exercise due care in performing the voluntarily assumed duty*, and a failure to exercise due care is negligence." (*Valdez*, *supra*, 129 Cal.App.2d at p. 817, italics added; see also *Aim Insurance*, *supra*, 229 Cal.App.3d at p. 216 [citing *Valdez* with approval and concluding the allegations in its case "state a cause of action for negligence based on Culcasi's alleged breach of his duty to perform with due care the task he undertook and upon which [the plaintiff] relied."].) As discussed above, we do not believe the California Supreme Court has precluded the

28

application of the voluntary undertaking theory of duty under negligence law to cases involving only economic loss, as in this case. (Cf. *Artiglio v. Corning Inc.*, *supra*, 18 Cal.4th at pp. 613-614.)

We are not persuaded by CT's argument that Bates cannot show it owed him a duty of care because he did not request it to perform a title search or otherwise verify the correct vesting information for the 2004 Trust Deed. If CT voluntarily undertook to, and did, prepare a replacement trust deed, CT owed Bates a duty of due care even if Bates did not ask CT to perform a title search or otherwise verify the correct vesting information for the 2004 Trust Deed. (Cf. *Valdez*, *supra*, 129 Cal.App.2d at p. 817; *Aim Insurance*, *supra*, 229 Cal.App.3d at p. 216.) *Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705, cited by CT, is factually inapposite and does not persuade us to reach a contrary conclusion. In *Summit*, the escrow holder simply followed the parties' explicit escrow instructions requiring it to pay off a note by disbursing the payment to Talbert. (*Id.* at p. 708.) Although the escrow holder was aware Talbert had assigned the note to the plaintiff, it did not owe the plaintiff any duty of care to make payment to it rather than Talbert. (*Ibid.*) Although *Summit* generally stated "an escrow holder's obligations are 'limited to faithful compliance with [the parties'] instructions' " (*id.* at p. 711), the facts in that case did not involve any voluntary undertaking by the escrow holder to make payment to the plaintiff. Because this case involves an alleged voluntary undertaking by CT, *Summit* is inapposite to this case and does not require summary judgment for CT.

29

Similarly, we reject CT's argument that it cannot owe any duty to third parties to an escrow (e.g., Bates) because escrow holders cannot be liable for any acts done outside of escrow. *Schaefer v. Manufacturers Bank* (1980) 104 Cal.App.3d 70, cited by CT, is factually inapposite and does not persuade us to reach a contrary conclusion. That case involves a side agreement outside of escrow between the plaintiff and a third party in which the escrow holder had no involvement. (*Id.* at pp. 73, 76-77.) By strictly complying with the escrow instructions, the escrow holder fulfilled its duties and owed no duty to the plaintiff based on the side agreement (of which it apparently had no knowledge). (*Id.* at pp. 72-73, 78.) *Schaefer* did not involve any voluntary agreement or undertaking by the escrow holder with the plaintiff. Because this case involves an alleged voluntary undertaking by CT, *Schaefer* is inapposite to this case and does not require summary judgment for CT.

We also reject CT's argument that it is entitled to summary judgment because it complied with the SDCCU escrow instructions and therefore could not have breached any duty it owed to a nonparty to those instructions (e.g., Bates). However, that argument is premised on CT's argument, discussed above, that it could not owe a third party any duty because its duties are limited to those owed to parties to the escrow and that arise out of explicit escrow instructions. However, as we concluded above, if CT voluntarily agreed or undertook to prepare the 2004 Trust Deed, it owed Bates a duty of due care even if Bates was not a party to the SDCCU escrow or if that undertaking was not set forth in the SDCCU escrow instructions. None of the cases cited by CT are apposite to this case or otherwise persuade us to reach a contrary conclusion. To the

30

extent CT argues it has not breached any duty it owed to Bates based on its voluntary undertaking, it does not persuade us there are no triable issues of material fact regarding whether it breached that duty and it is entitled to summary judgment as a matter of law.

Although CT also argues it cannot be liable for negligence because Bates did not expressly or implicitly instruct it to verify the vesting information for the 2004 Trust Deed, Bates asserted below, and asserts on appeal, that his negligence cause of action is not based on any request that CT verify the vesting information. Rather, Bates asserts CT's negligence liability is based on its duty of due care owed him arising out of its voluntary undertaking and its knowledge that RRV3, and not Raytheon, was the correct trustor for the 2004 Trust Deed. Therefore, the absence of any request by Bates that CT verify the vesting information for the 2004 Trust Deed does not entitle CT to summary judgment.

Finally, CT argues Bates's negligence cause of action is, in effect, a title insurance claim. Because Bates did not purchase title insurance for the 2004 Trust Deed, CT argues he cannot recover on that claim. Bates concedes he did not purchase title insurance or request that CT perform a title search for the 2004 Trust Deed. Nevertheless, Bates asserts his negligence cause of action against CT is independent of any contractual claim he might have had he purchased title insurance or any other cause of action he may have had had he requested that CT perform a title search. Had Bates purchased title insurance, he presumably would have had an alternative or secondary means of obtaining relief for the injury he suffered in addition to his negligence cause of

31

action.  A breach of contract claim and a negligence claim generally are not, in effect, the same cause of action.  To the extent the trial court concluded otherwise, it erred.

*CT'S CROSS-APPEAL*

IV

CT filed a cross-appeal challenging the order denying its motion for leave to augment its expert witness list or, in the alternative, leave to submit tardy expert witness information.  However, because, as we explain below, that order is nonappealable, we dismiss the cross-appeal.

A

"The existence of an appealable judgment is a jurisdictional prerequisite to an appeal.  A reviewing court must raise the issue on its own initiative whenever a doubt exists as to whether the trial court has entered a final judgment or other order or judgment made appealable by . . . section 904.1."  (*Jennings v. Marralle* (1994) 8 Cal.4th 121, 126.)  "A reviewing court has jurisdiction over a direct appeal only when there is (1) an appealable order or (2) an appealable judgment.  [Citations.] . . . [¶]  A trial court's order is appealable when it is made so by statute."  (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 696.)  "[A]n attempt to appeal from a nonappealable judgment or order will ordinarily be dismissed."  (*Marsh v. Mountain Zephyr, Inc.* (1996) 43 Cal.App.4th 289, 297.)

Section 904.1 generally sets forth those judgments and orders that are appealable. In general, an appeal may be taken from a judgment other than an interlocutory judgment. (§ 904.1, subd. (a)(1).)  Accordingly, interlocutory rulings or orders, such as discovery

and evidentiary rulings, are generally not appealable. (*Fraser-Yamor Agency, Inc. v. County of Del Norte* (1977) 68 Cal.App.3d 201, 207; *Doe v. United States Swimming, Inc.* (2011) 200 Cal.App.4th 1424, 1432-1433; *Datig v. Dove Books, Inc.* (1999) 73 Cal.App.4th 964, 984; *Haro v. City of Rosemead* (2009) 174 Cal.App.4th 1067, 1078-1079 [dismissing appeal from nonappealable order denying motion for leave to amend complaint].)

However, certain nonappealable intermediate rulings may be challenged on appeal from a subsequent final judgment if they are directly related to the judgment being appealed. Section 906 provides:

> "Upon an appeal pursuant to Section 904.1 or 904.2, the reviewing court may review the verdict or decision and any intermediate ruling, proceeding, order or decision which involves the merits *or* necessarily affects the judgment or order appealed from *or* which substantially affects the rights of a party, . . . and may affirm, reverse or modify any judgment or order appealed from . . . ." (Italics added.)

In *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939 (*Cahill*), we stated: "[I]f a decision (e.g., final judgment) is properly appealed pursuant to section 904.1 or 904.2, section 906 allows us to 'review' certain 'intermediate' orders or other rulings not otherwise directly appealable." (*Id*. at p. 946.) There are three circumstances in which we may review a nonappealable order pursuant to section 906. (*Id*. at pp. 946-948.) The nonappealable order must either: (1) "involve[] the merits" of the judgment appealed from; (2) "necessarily affect[]" the judgment appealed from; or (3) "substantially affect[] the rights of a party." (§ 906; *Cahill*, at pp. 946-948.) Regarding the third circumstance, we stated:

33

"The clear import of that provision is to allow an appellate court to review rulings, orders, or other decisions that led up to, or directly related to, the judgment or order being appealed to the extent they substantially affected the rights of one of the parties to the appeal. It is implicit within section 906's language that the 'intermediate' order or decision that substantially affects the rights of a party must be one that led up to, or directly relates to, the judgment or order being appealed.

"Therefore, *nonappealable orders* or other decisions substantively and/or procedurally collateral to, and *not directly related to*, *the judgment* or order *being appealed are not reviewable pursuant to section 906* even though they literally may 'substantially affect[]' one of the parties to the appeal." (*Cahill*, *supra*, 194 Cal.App.4th at p. 948, italics added.)

Finally, we note that a cross-appeal is subject to the same jurisdictional requirements as an appeal. Accordingly, if a cross-appeal challenges a nonappealable order, that order must meet the requirements of section 906, as discussed above. If it does not, we must dismiss the cross-appeal.

B

In this case, the trial court issued an order denying CT's motion for leave to augment its expert witness list or, in the alternative, leave to submit tardy expert witness information. CT does not cite, and we are unaware of, any statutory authority (e.g., § 904.1) making such an order appealable. Given that the order is nonappealable, we consider whether section 906 allows us to review it. The judgment from which Bates appeals is the judgment entered following the court's order granting CT's motion for summary judgment. That summary judgment order is reviewable in an appeal of the final judgment. (§ 904.1, subd. (a)(1); § 437c, subd. (m)(1); *Levy v. Skywalker Sound* (2003) 108 Cal.App.4th 753, 761, fn. 7.)

34

However, none of section 906's provisions for review of a nonappealable order apply to allow us to review the order denying CT's motion for leave to augment its expert witness list or, in the alternative, leave to submit tardy expert witness information. First, that order did not involve the merits of the summary judgment being appealed. Rather, it involved a collateral ruling regarding what expert witnesses CT could use at trial. The merits of the summary judgment were based on the question of whether there are triable issues of material fact and whether CT is entitled to judgment as a matter of law. CT's motion for leave to augment did not involve any issues regarding whether there are triable issues of material fact. Furthermore, because the trial court granted CT's motion for summary judgment, it could have deferred any decision on CT's separate motion for leave to augment until such time, if any, that its summary judgment was reversed and the matter remitted to it.

Second, the order denying CT's motion for leave to augment did not necessarily affect the summary judgment. Instead, it had no effect on the summary judgment. Whether CT was given leave to augment its expert witness list or submit tardy expert witness information had no relation to the issue of whether there are triable issues of material fact and whether CT is entitled to summary judgment as a matter of law.

Finally, the order denying CT's motion for leave to augment was not directly related to the summary judgment. Again, whether CT was given leave to augment its expert witness list or submit tardy expert witness information had no relation to the issue of whether there are triable issues of material fact and whether CT is entitled to summary

35

judgment as a matter of law. Accordingly, that order did not substantially affect CT's rights within the meaning of section 906. (*Cahill*, *supra*, 194 Cal.App.4th at p. 948.)

We conclude the order denying CT's motion for leave to augment its expert witness list or, in the alternative, leave to submit tardy expert witness information is not appealable pursuant to section 904.1, section 906, or otherwise. Therefore, we must dismiss CT's cross-appeal of that order for lack of jurisdiction. (*Marsh v. Mountain Zephyr, Inc.*, *supra*, 43 Cal.App.4th at p. 297.)

DISPOSITION

The judgment is reversed and the matter is remanded to the trial court for further proceedings. The cross-appeal is dismissed. Each party shall bear its own costs on appeal.

McDONALD, Acting P. J.

WE CONCUR:

McINTYRE, J.

O'ROURKE, J.